UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| KELLY S. COOLIDGE, | ) | |
|       Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:04-CV-1240-SEB-VSS |
| | ) | |
| CONSOLIDATED CITY OF | ) | |
| INDIANAPOLIS AND MARION | ) | |
| COUNTY, | ) | |
|       Defendant. | ) | |

**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This case is before the Court on the Motion for Summary Judgment [Docket No. 36] filed by Defendant, Consolidated City of Indianapolis and Marion County ("the City").  For the reasons detailed in this entry, we hold that Defendant's motion is well-taken and GRANT summary judgment in its favor.

Plaintiff, Kelly Coolidge ("Ms. Coolidge"), brings this lawsuit against the City alleging sex discrimination, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983.  She claims that the City created a hostile work environment and unlawfully retaliated against her by failing to promote her, issuing her written reprimands, and eventually terminating her employment.  The City denies such discrimination and argues that, because there are no material facts in controversy, summary judgment should be entered in its favor, pursuant to Fed. R. Civ. P. 56.

## Factual Background[1]

Ms. Coolidge began working for the City in December of 1998 as a Morgue Liaison for the Indianapolis-Marion County Forensic Services Agency ("Agency" or "Crime Lab").  Compl. ¶ 6.  Around this same time, a male employee, John Cook ("Mr. Cook"), was also hired as a Morgue Liaison.  Def.'s Mem. at 2.  The City assigned David Willoughby ("Mr. Willoughby"), a forensic illustrator[2] at the Agency, to train Ms. Coolidge and make recommendations regarding her employment with the Agency. Compl. ¶ 7; Def.'s Mem. at 2.

---

[1] With regard to the facts presented to Court, the City argues that "much of the testimony presented in Plaintiff's affidavit should be stricken for the . . . reason that it concerns matters unequivocally covered in her depositions."  Def.'s Reply at 3.  The City cites Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1296 (7th Cir. 1993) as support for this argument.  That case holds that "[i]n this circuit, a party may avoid summary judgment by submitting an affidavit that conflicts with its earlier deposition testimony in only a limited number of circumstances."  Id. (quoting Adelman-Tremblay v. Jewel Companies, Inc., 859 F.2d 517, 520 (7th Cir. 1988)).  In its Reply, the City notes several topics that were "covered" by Ms. Coolidge in both her affidavit and earlier deposition testimony.  However, it neglects to assert any way in which the affidavit contradicts or is otherwise inconsistent with the deposition testimony.  While Slowiak arguably requires that we not consider contradictory evidence unless an explanation of the inconsistency were provided by Ms. Coolidge, it does not require us to "strike" portions of an affidavit that were simply "covered" in deposition testimony.  Therefore, the Court will not disregard Ms. Coolidge's testimony on this basis.

In addition, the City asserts that Ms. Coolidge has failed "to properly authenticate any of the documents designated in support of her affidavit and thereby in support of her opposition to Defendant's motion for summary judgment."  Def.'s Reply at 6.  Thus, the City argues, these documents are not admissible for the purpose of overcoming summary judgment, and the facts contained within them should not be considered by the Court.  Ms. Coolidge states that the City's objection to the documents is too "vague [and] general" and does not meet the specificity requirement for an evidentiary objection, as required by Fed. R. Evid. 103(a)(1).  Because we are granting summary judgment in favor of the City on other grounds, see infra, we decline to yield to the City's generalized assertion at this time, and note that we have considered the documents submitted by Ms. Coolidge in support of her affidavit.

[2] Mr. Willoughby's official job title was "forensic scientist III."  Def.'s Mem. at 2.

*Ms. Coolidge's Prior Sexual Harassment Complaints*

Sometime around January of 1999, Ms. Coolidge began complaining to her supervisors that she was being sexually harassed by Mr. Willoughby, and on April 15, 1999, Ms. Coolidge filed a complaint with the City of Indianapolis Division of Equal Opportunity regarding this harassment.  Compl. ¶¶ 8, 10.  On April 16, 1999, upon referral by the City of Indianapolis Division of Equal Opportunity, Ms. Coolidge filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC"), which subsequently (on October 25, 1999) issued a Determination that the City had subjected Ms. Coolidge to sexual harassment.  Compl. ¶¶ 10, 11, 12.  Ms. Coolidge asserts that, during this entire period, the City failed to take corrective action to end Mr. Willoughby's harassment of her.  Pl.'s Br. at 1; Compl. ¶¶ 9, 13, 16.

In 2000, Ms. Coolidge received a promotion to the position of "forensic scientist I."[3]  Def.'s Mem. at 2, citing Coolidge Dep. I 33:16-20.  Mr. Cook received a similar promotion, and both Mr. Cook and Ms. Coolidge received identical pay increases.  Def.'s Mem. at 2.

On September 1, 2000, Ms. Coolidge filed a second complaint with the EEOC, this time based on a claim of retaliation by the City;[4] on November 2, 2000, the EEOC issued

─────────────────────

[3] It should be noted that Ms. Coolidge disputes whether this job change was a promotion. She contends that she and Mr. Cook "were required by the defendant to work more hours and their overtime was taken away, so the action was a demotion."  Pl.'s Br. at 7.

[4] Ms. Coolidge's retaliation claim against the City was based on her allegations that the City "took away paid overtime from Ms. Coolidge and her partner who was a witness to the

(continued...)

a determination that the City had retaliated against Ms. Coolidge.  Compl. ¶¶ 18, 19.

On December 4, 2001, Ms. Coolidge filed her first complaint against the City in this court, which was based on her previous sexual harassment complaints.  Compl. ¶ 20; Def.'s Mem. at 3; see Coolidge v. Consol. City of Indianapolis and Marion County Forensic Servs. Agency, IP 01-1836-C-M/S.  On February 14, 2003, the City filed a Motion for Summary Judgment in the above cause.  Compl. ¶ 22.  Certain of Ms. Coolidge's claims survived summary judgment and proceeded to jury trial; the parties eventually resolved that lawsuit via post-verdict settlement.  Def.'s Mem. at 3.

*The Hiring of Sami Mekki*

David Willoughby retired from his employment with the Crime Lab in December 2002.  Compl. ¶ 25; Def.'s Mem. at 4.   When the City sought to hire a replacement for his former position, Ms. Coolidge, who was interested in the forensic scientist position, wrote a memo to Director James Hamby ("Director Hamby") and her supervisor, Ron Blacklock ("Mr. Blacklock"), stating that she wished to be considered for the open position.  Def.'s Mem. at 4; Pl.'s Br. at 8.  The City maintains that Ms. Coolidge did not have the requisite experience for the position.  Def.'s Mem. at 4, citing Coolidge Dep. II 222:1-8, Hamby Dep. 13:6-14.  Therefore, she was not considered for the position.

---

[4](...continued)
sexual harassment, required them to work longer hours, gave them more duties which had previously been some of Mr. Willoughby's duties, gave Ms. Coolidge less training than her co-workers, and rated her low on judgment and procedures."  Compl. ¶ 17.

Mr. Cook, the male employee hired at approximately the same time as Ms. Coolidge, also expressed interest in the position. He was also not promoted to the position, a fact which the City attributes to his similar inexperience. Def.'s Mem. at 5, citing Hamby Dep. 12:19-21, 76:10 - 77:10.

In February of 2003, Sami Mekki ("Mr. Mekki") was hired for Mr. Willoughby's former position, and he began work the following month. Def.'s Mem. at 4. Director Hamby had met Mr. Mekki in Dubai. Pl.'s Br. at 10. Mr. Mekki was also an acquaintance of another Crime Lab employee. Id. The City contends that Mr. Mekki had experience and education that qualified him for the job. Specifically, he has a bachelor's degree in business administration from a university outside the United States, an associate's degree in graphic design and animation from a United States university, diplomas in photography and art, nine years of forensic experience in Saudi Arabia, and some experience working as a morgue photographer at a forensic center in Phoenix. Def.'s Mem. at 4-5; Pl.'s Br. at 9-10.

Ms. Coolidge maintains that Mr. Mekki was less qualified for the position than she because his bachelor's degree came from an "unrecognized" university, his forensic experience was largely outside the United States, and he could not recall the name of any case in which he claimed to have previously testified. Pl.'s Br. at 2. Further, according to Ms. Coolidge, Mr. Mekki had no experience handling evidence, fingerprinting, or dealing with chain of custody issues. Pl.'s Br. at 9. Ms. Coolidge asserts that her bachelor's degree from a "recognized" university and her four years of forensic experience within

the Crime Lab better qualified her for the position and that Director Hamby failed to

consider this in his hiring decision.[5]  Pl.'s Br. at 2.

*The Pornographic Videotapes and Ms. Coolidge's Reprimand for Their Removal*

On August 27, 2003, Ms. Coolidge was reorganizing a Crime Lab cabinet in order

to make room for some blank videotapes.  The cabinet had previously been used by Mr.

Willoughby when he was employed at the Crime Lab.  Def.'s Mem. at 5.  Ms. Coolidge

discovered five or six videotapes in the cabinet which were not clearly marked.[6]  She

proceeded to watch parts of the videotapes so that she might properly label them.[7]  Def.'s

Mem. at 5.  Two of the videotapes depicted pornographic matter.  Ms. Coolidge was

offended, indeed, sickened by the graphic contents of the videotapes, and was made to

feel physically ill because of them.[8]  Pl.'s Br. at 2.  Ms. Coolidge believed that the

---

[5] There is some dispute about the requisite years of experience required to move up a "step" as a forensic scientist, as Ms. Coolidge wished to do.  Mr. Hamby stated in his deposition that six years of experience are required; Ms. Coolidge maintains that only four years are required.  Pl.'s Br. at 9, citing Hamby Dep., 21:4-6, 35:23-24; Coolidge Aff. Attach. 18.

[6] The City maintains that the videotapes were "unmarked."  Def.'s Mem. at 5, citing Coolidge Dep. II 184:1-185:6.  Ms. Coolidge states that one was labeled with an "X" and the other was labeled "special."  Pl.'s Br. at 13.

[7] The City notes that Ms. Coolidge "was not asked to clean out the cabinet where she found the video tapes, and it was not a part of her job to do so. . . . She was also not directed and it was not a part of her job description to watch any unmarked videos."  Def.'s Mem. at 6.  However, Ms. Coolidge responds that her job encompassed things like keeping videotapes organized and duplicating crime scene videotapes, so it was necessary to label these videotapes in order to let other employees know what they were.  Pl.'s Br. at 12.

[8] One videotape was titled "Ass Eaters" and depicted oral sex with a woman's anus.  The
(continued...)

videotapes were the property of Mr. Willoughby, who had retired several months before, and that he had intentionally left them in the cabinet for her to find as a form of harassment.  Def.'s Mem. at 6, citing Coolidge Dep. II 190:8-191:4.

On September 22, 2003 – nearly a month after finding the videotapes[9] – Ms. Coolidge reported them to Crime Lab management.  Her supervisor, Mr. Blacklock, in addition to notifying Director Hamby, viewed portions of the videotapes and contacted Mr. Willoughby about them.  This appears to have been the extent of the investigation by the Agency in response to Ms. Coolidge's complaint.  Def.'s Mem. at 7; Pl.'s Br. at 14.

Although the lack of clear labeling on these particular videotapes suggests that they were not case-related, Ms. Coolidge states that Mr. Blacklock told her she could be requested to make copies of material such as the pornographic videotapes on any given day.  Pl.'s Br. at 14, citing Coolidge Aff. Attach. 25.   The City notes that the Crime Lab employees were sometimes required to make copies of pornographic videotapes brought to it by investigators in the course of business: for example, in a case involving an adult bookstore.  Def's Mem. at 6.

Prior to reporting the existence of the videotapes to Crime Lab management, Ms. Coolidge removed the tapes from the Crime Lab and took them to her home in order to

_____

[8](...continued)
other was titled "Nekromantik 2" and featured necrophilic activities and other disturbing images. Pl.'s Br. at 26.

[9] Ms. Coolidge asserts that the reason for the delay in her reporting of the tapes to management was fear that she would be retaliated against and that the tapes would be destroyed. Pl.'s Br. at 13.

copy them for use in her complaint against the City.  She had problems with her home VCR and took them to her attorney's office, where her attorney made copies of the tapes. Def.'s Mem. at 8.  She then returned the tapes to the Crime Lab.  Ms. Coolidge stated that she copied the tapes because she was afraid the City would destroy the tapes, which she perceived to be evidence of a hostile work environment.  Pl.'s Br. at 3, citing Coolidge Aff. Attach. 20-23.  On October 2, 2003, approximately ten days after returning the tapes, Ms. Coolidge informed Mr. Blacklock that she had removed and copied them.  Def.'s Mem. at 8.

The City states that its policies do not permit Crime Lab employees to remove Crime Lab property from the lab without prior permission.  Def.'s Mem. at 8, citing Coolidge Dep. II, 206:12-23.  On October 10, 2003, Ms. Coolidge was therefore issued a written reprimand for violating this policy by removing the videotapes from the lab. Def.'s Mem. at 9.[10]  Ms. Coolidge maintains that the tapes were not evidence in a criminal case or Crime Lab property, and thus were not subject to the policy.  Pl.'s Br. at 3. Further, she disputes whether there is in fact such a policy, and maintains that Crime Lab property is often removed from the Crime Lab without authorization.  Pl.'s Br. at 18.

On October 31, 2003, Ms. Coolidge filed a third EEOC complaint alleging sexual

---

[10] The City claims that the Crime Lab's personnel manual permits disciplinary measures up to or including termination for misuse of county property, and that Ms. Coolidge's letter of reprimand was a less severe disciplinary measure than that she could have received.  Def.'s Mem. at 9.  Ms. Coolidge responds that the provision in the manual about misuse of county property is vague, and though it does mention unauthorized removal of county property, it does not state that county property cannot be taken off county premises.  Pl.'s Br. at 18, citing Coolidge Aff. ¶ 73.

harassment (based on her viewing of the videotapes) and retaliation (based on her lack of

promotion to Mr. Willoughby's former position, and her disciplinary reprimand for

removal of the videotapes).  Def.'s Mem. at 3-4; Pl.'s Br. at 3.

In January of 2004, Ms. Coolidge was promoted to a "forensic scientist II" position,

and received another pay increase.  She had not applied for this position.  Def.'s Mem. at

2-3.

*Ms. Coolidge's Reprimand for Failure to Perform Duties*

In January or February of 2005, Ms. Coolidge was issued another disciplinary

reprimand for having failed to make a stain card for blood from a rape kit before disposing

of the blood.  She received a written reprimand as a result of this error.  Def.'s Mem. at 9.

*Ms. Coolidge's Termination for Copying Notes from a Case File*

Ms. Coolidge was assigned the task of peer reviewing a case file, during which

review she found a note about an error Mr. Mekki had made in the case.[11]  She copied the

note, kept a copy for herself, and gave a copy to her attorney.  Def.'s Mem. at 9.  Crime

Lab Director Mike Medler ("Mr. Medler") learned that Ms. Coolidge had copied the case

---

[11] Ms. Coolidge asserts that Mr. Mekki failed to fingerprint a body, which was later
buried, and that this mistake was detrimental to a criminal case.  However, Mr. Mekki was not
reprimanded for this mistake, though Ms. Coolidge had been reprimanded for her failure to make
a blood stain, a mistake which she claims was not detrimental to a criminal case.  Pl.'s Br. at 4,
19.  Ms. Coolidge reports that she complained about the disparate treatment to Crime Lab
Director Medler, but that he failed to take corrective action.  Pl.'s Br. at 4, citing Coolidge Aff.
Attach. 36.

note only after she disclosed this information during her deposition in this lawsuit.  Def.'s Mem. at 10, citing Medler Dep., 50:19-52:2.

Mr. Medler considered this action by Ms. Coolidge to constitute an unauthorized release of confidential information.  The City asserts that her action was "a violation of the Crime Lab's internal policies and the Marion County rules relating to the unauthorized release of confidential information."  Def.'s Mem. at 10.  Ms. Coolidge maintains that the lab note was not "evidence" in a criminal case, and thus is not covered by the policies of the Crime Lab.  Pl.'s Br. at 19-21.  Further, she asserts that "Marion County rules relating to the unauthorized release of confidential information" are not in evidence, and that an employee "consulting with her own attorney about information she lawfully has is not unauthorized release of information, whatever that vague term means."  Pl.'s Br. at 21-22.

Due to this alleged violation and Ms. Coolidge's previous disciplinary record, Mr. Medler terminated Ms. Coolidge's employment with the Crime Lab on May 19, 2005.[12] Def.'s Mem. at 3, 10.  Mr. Medler stated in his deposition that he terminated Ms. Coolidge for three contributing reasons: her reprimand for making a copy of the pornographic videotapes; her reprimand for failure to perform duties, related to the blood stain mistake; and her violation of rules by copying and giving to her attorney a copy of the case file note.[13]  Pl.'s Br. at 6.  Ms. Coolidge's complaint in this lawsuit was filed on July 28, 2004;

---

[12] Ms. Coolidge notes that Mr. Medler did not consult with anyone else in making the determination to terminate Ms. Coolidge's employment.  Pl.'s Br. at 5-6.

[13] Ms. Coolidge disputes whether there was, in fact, a stated policy that prohibited her
(continued...)

her employment was terminated on May 19, 2005.[14]


Legal Analysis

**A.      Summary Judgment Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," Id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 692 (7th Cir. 2000).

---

[13](...continued)
release of the case file note to her attorney.  She states that she was not informed when she spoke to Mr. Medler that her action was violative of any specific Crime Lab policy.  Pl.'s Br. at 5.

[14] Ms. Coolidge's retaliation claim based on her termination first arose in the summary judgment pleadings, dated August 29, 2005 and March 20, 2006.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee,

246 F.3d 927, 933 (7th Cir. 2001); <u>Stagman v. Ryan</u>, 176 F.3d 986, 995 (7th Cir. 1999);

<u>Slowiak v. Land O'Lakes, Inc.</u>, 987 F.2d 1293, 1295 (7th Cir. 1993).

**B.     The Plaintiff's Sexual Harassment Claim**

Ms. Coolidge contends that the City subjected her to a hostile work environment in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C.

§ 1981, when she was exposed to pornographic videotapes while carrying out her job

duties.  The City denies this claim, arguing that the alleged conduct was not severe or

pervasive, that the City was not negligent in discovering or remedying the alleged

harassment, and that there is no evidence that the alleged harassment was directed at Ms.

Coolidge because of her sex.

Title VII provides that "it shall be an unlawful employment practice for an

employer ... to fail or refuse to hire or to discharge any individual, or otherwise to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or

national origin."  42 U.S.C. § 2000e-2(a)(1).  In <u>Meritor Sav. Bank v. Vinson</u>, 477 U.S. 57

(1986), the Supreme Court clarified that the "terms, conditions, or privileges of

employment" language in Title VII encompasses *environmental* conditions of

employment, and that the scope of the prohibition "is not limited to 'economic' or

'tangible' discrimination."  <u>Id.</u> at 64.  Therefore, "a plaintiff may establish a violation of

Title VII by proving that discrimination based on sex has created a hostile or abusive work

environment." Id. at 66.

In order to rise to the level of a hostile work environment that violates Title VII, a plaintiff must show that he or she was sexually harassed because of his or her sex, and that the harassment was "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted)). See also Hilt-Dyson v. City of Chicago, 282 F.3d 456, 462-63 (7th Cir. 2002), cert. denied, 537 U.S. 820 (2002) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (citation and internal quotation marks omitted)). A hostile work environment must be both objectively and subjectively abusive; that is, a reasonable person would find it hostile, and the victim of the harassment did in fact find it to be so. Faragher, 524 U.S. at 787.

In order to determine whether a working environment is objectively hostile, courts may consider factors including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Hilt-Dyson, 282 F.3d at 463 (quoting Faragher, 524 U.S. at 787-88). Conduct that is unpleasant, but is not severe or pervasive, will not constitute a hostile work environment prohibited by Title VII. See Saxton v. American Telephone and Telegraph Co., 10 F.3d 526, 533 (7th Cir. 1993).

Additionally, the onus is placed on the employee to make the employer aware of

the harassment, as well as to avail himself or herself of any preventive or corrective measures the employer may provide.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). When the harasser is a co-employee, an employer may be liable only if it has "been negligent either in discovering or remedying the harassment." Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1032 (7th Cir. 1998) (quoting Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997)).  Once an employer is made aware of the problem, the "employer's legal duty in co-employee harassment cases will be discharged if it takes 'reasonable steps to discover and rectify acts of sexual harassment by its employees.'" Hall v. Bodine Elec. Co., 276 F.3d 345, 356 (7th Cir. 2002) (quoting Parkins, 163 F.3d at 1032 (internal citation omitted)).

### 1.     Severe and Pervasive Conduct

The City argues that Ms. Coolidge's hostile work environment claim fails for three reasons, which we will address in turn.  First, the City asserts that Ms. Coolidge does not cite conduct sufficiently severe or pervasive to support her claim of a hostile work environment.  The City emphasizes that Ms. Coolidge's viewing of the videotapes was a single incident, within Ms. Coolidge's control (presumably because she could have turned off the tapes if she wanted to, and the alleged harasser was not present when she viewed them), and that "[r]elatively isolated instances of non-severe misconduct will not support a hostile environment claim." Saxton, 10 F.3d at 533 (quoting Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir. 1993)).  The City asserts that Ms. Coolidge

faced no performance problems associated with viewing the tapes, and that she continued to succeed in the workplace, earning a promotion approximately four months after viewing the tapes.  Def.'s Mem. at 14-15.  Moreover, the City maintains that there is no evidence aside from Ms. Coolidge's speculation to support her contention that the videotapes were directed at her by her alleged former harasser, Mr. Willoughby, who had retired from the Crime Lab several months earlier.  The Seventh Circuit has recognized that the impact of such "second-hand" harassment is "not as great as the impact of harassment directed at the plaintiff."  Cowan v. Prudential Ins. Co. of America, 141 F.3d 751, 758 (7th Cir. 1998) (quoting Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1144 (7th Cir. 1997)).  Therefore, the City maintains that the videotape incident does not rise to the level of "severe and pervasive" harassment that would constitute a hostile work environment.

Ms. Coolidge responds that the alleged harassment here *was* severe and pervasive. She argues that the pornography contained on the videotapes was severe and graphic in nature, and that viewing the tapes made her feel ill and disgusted.  She also claims that exposure to the pornography added to the sexual harassment she had already suffered at the hands of Mr. Willoughby – that harassment which was addressed in her previous trial and settlement – and thus her stress, she felt, was aggravated.

We find that the videotape incident does not constitute a hostile work environment because the conduct here was not severe and pervasive.  We do not question that Ms. Coolidge was offended by the presence of the pornographic videotapes which she happened upon in the cabinet during her organizing and cleaning efforts.  However, the

16

law is clear that conduct that rises to the level of severe and pervasive sexual harassment must be so prevalent or atrocious as to materially alter the conditions of the victim's employment.  See Oncale, 523 U.S. at 78; Hilt-Dyson, 282 F.3d at 463.  No such conditions have been demonstrated by Ms. Coolidge here.  Her viewing of the videotapes was at most an isolated incident of indirect sexual harassment.  The alleged harasser was not present when Ms. Coolidge viewed the videotapes, and she claims no other harassment by him during the period between his retirement and the filing of this lawsuit.  Also, as the City points out, Ms. Coolidge's job performance did not suffer after she viewed the videotapes.

Ms. Coolidge focuses on the graphic and "severe" nature of the pornography on the videotapes.  While this is relevant, she relies too heavily upon it, and does not demonstrate that the *harassment itself* was severe or pervasive.  When Ms. Coolidge first discovered the tapes, they were in their benign boxes with no outward indication of their contents.  Ms. Coolidge took it upon herself to examine them further, not at the direction of her employer who knew their contents, but voluntarily.  While the videotapes were no doubt very unpleasant to watch, it remains that they were simply videotapes, which, we repeat, she was not forced to view and was free to turn off, and that she was not harmed by nor exposed to her alleged harasser at any point during or after the isolated viewing incident.  Further, no evidence has been adduced beyond Ms. Coolidge's speculations that this was a plot hatched by her former nemesis, Mr. Willoughby, for which the City should be held liable.  As previously stated, unpleasant conduct that is not severe or pervasive does not

17

constitute a Title VII violation.  See Saxton, 10 F.3d at 533.

Ms. Coolidge maintains that the adverse impact the videotapes had on her compounded the sexual harassment she had previously suffered from Mr. Willoughby's prior misconduct, making her more vulnerable to the videotapes.  However, Ms. Coolidge's prior sexual harassment claims have already been fully resolved by Ms. Coolidge's previous lawsuit against, and settlement with, the City.  We cannot reconsider the merits of those claims in this proceeding without violating the principle of *res judicata*.[15]  Ms. Coolidge is not permitted to "double-dip" by attempting to rely on the alleged sexual harassment in her previous case to make the incident advanced in this litigation appear more severe or pervasive.[16]

### 2. *Negligence in Discovering or Remedying the Alleged Harassment*

In addition, the City seeks summary judgment on the grounds that Ms. Coolidge has failed to show that the City was negligent in discovering or remedying the alleged harassment.  The uncontroverted evidence establishes that Ms. Coolidge did not report the

---

[15] A judgment resulting from a settlement is considered to be a final judgment "on the merits" for purposes of *res judicata* and claim preclusion.  See In re Energy Co-Op, Inc., 814 F.2d 1226, 1234 (7th Cir. 1987), cert. denied, 484 U.S. 928 (1987).

[16] Ms. Coolidge asserts that her use of the prior incidents here merely goes to show her state of mind when the videotape incident occurred.  However, the fact that Ms. Coolidge may have felt more than usually vulnerable to sexual harassment does not establish that the Defendant's *conduct* constituted severe or pervasive harassment.  As previously stated, a hostile environment must be both subjectively *and objectively* hostile in order to constitute sex discrimination.  See Faragher, 524 U.S. at 787.  Ms. Coolidge's state of mind is not dispositive on this point, as we do not find the videotape incident to have created an *objectively* hostile environment.

existence of the videotapes to her supervisor for nearly a month.  Once her supervisor, Mr.

Blacklock, was notified, he undertook an investigation by informing the director and

contacting Mr. Willoughby about the videotapes.  Given that Mr. Willoughby was retired

and could not be terminated or disciplined as an employee, the City maintains that it did

all that was possible under the circumstances to remedy the alleged harassment.

Ms. Coolidge argues that the City was negligent in discovering and responding to

the alleged harassment.  She states that the City "knew that it had pornographic video

tapes, but it had no policy or procedure for treating pornographic video tapes differently

from other video tapes. . . . The defendant had no training [*sic* – presumably "provided" no

training] on copying pornographic video tapes. . . . The defendant failed to have

procedures to prevent females from being exposed to pornographic video tapes."  Pl.'s Br.

at 27 (internal citations omitted).  Further, Ms. Coolidge asserts that the City was negligent

in failing to adequately discipline Mr. Willoughby *before* the videotape incident for his

other alleged sexual harassment – that harassment which was the subject of the prior legal

proceeding involving Ms. Coolidge – so that the incident would presumably not have

occurred in the first place.  Ms. Coolidge also asserts that the City did not sufficiently

investigate the incident or implement a policy to protect her and other women from similar

harassment in the future.[17]

We find that Ms. Coolidge has not adequately demonstrated that the City was

---

[17] We find this an interesting claim (perhaps gender biased in its own right) since, based
on the descriptions of the contents of the videotapes, we would expect the material to be as
repugnant to men of ordinary sensibilities as to women.  See discussion in Section B.3 infra.

negligent in preventing or remedying the harassment.  Mr. Willoughby was no longer employed in the Crime Lab when the videotape incident occurred.  Ms. Coolidge waited nearly a month before notifying her supervisor of her discovery, who then investigated the incident insofar as he viewed portions of the tapes and contacted Mr. Willoughby for an explanation.  Since Mr. Willoughby was not an employee of the Crime Lab at that point, and Ms. Coolidge was not exposed to any sexual harassment or contact with Mr. Willoughby after the incident, we agree with the City that it did all that it could under the circumstances to effectively address the specific videotape incident – that is, that the City took "reasonable steps to discover and rectify acts of sexual harassment by its employees," thus "discharg[ing]" its "legal duty."  Hall, 276 F.3d at 356.  Ms. Coolidge asserts that the City was negligent by not dealing with Mr. Willoughby properly *before* the videotape incident, in light of his alleged prior misconduct, under a theory that she would never have viewed the tapes if Mr. Willoughby had been disciplined previously.  We decline to consider this somewhat speculative "but-for" assertion by Ms. Coolidge, which depends upon claims previously adjudicated and resolved in her prior lawsuit against the city.  As stated above, we will not re-evaluate on the merits those matters previously settled between the parties, as such a review is precluded by the doctrine of *res judicata*. Considering only those claims properly before the Court – that is, the claim of harassment related to the videotapes – we find that the City acted properly with respect to that incident.

Ms. Coolidge further asserts that the City was negligent by failing to put into place

a general policy regarding pornography in the Crime Lab.  She places heavy emphasis on a statement by Mr. Blacklock that she might be exposed to pornographic materials "on any given day" (Coolidge Aff. Attach. 25), making reference to this statement eleven times in the Plaintiff's Brief and four more times in her Surreply.  Ms. Coolidge's pleadings appear to interpret Mr. Blacklock's statement as a threat that she, and presumably other female coworkers, could be subject at anytime to exposure to personal, non-work-related pornography.  However, Mr. Blacklock's statement appears to us to be more reasonably understood with reference to the fact that, as previously discussed, the Crime Lab is on occasion required to receive and maintain pornography seized in connection with certain cases.  See Blacklock Dep. I, 63:21-68:6.  Ms. Coolidge does not claim to have encountered any pornography on the job before or since the single videotape incident at issue here, and shows no evidence that her supervisors were or should have been aware of personal pornography in the Crime Lab before or since the incident.  Therefore, in our view the City did not act unreasonably by not putting into effect a general policy for dealing with pornography at the Crime Lab, as no such need has been demonstrated.

     *3.    Whether the Alleged Harassment was Based on Ms. Coolidge's Sex*

The City's final argument is that Ms. Coolidge has failed to demonstrate that the alleged harassment was directed toward her because of her sex.  A sexual harassment claim based on Title VII is "to be determined on a gender-comparative basis" – that is, "the critical issue ... is whether members of one sex are exposed to disadvantageous terms

21

or conditions of employment to which members of the other sex are not exposed."

Holman v. Indiana, 211 F.3d 399, 403 (7th Cir. 2000) (quoting Harris v. Forklift Sys., 510

U.S. 17, 25 (1993) (Ginsburg, J., concurring)).  The City claims that Ms. Coolidge cannot

prove that the existence of the pornographic videotapes in the Crime Lab was connected to

her gender.  The fact that they were left, insufficiently labeled, in a file cabinet, without

being clearly directed toward anyone in particular, and that their contents are offensive to

both men and women, illustrates that the alleged harassment here was not gender-specific.

Ms. Coolidge asserts, in conclusory fashion, that there is evidence that the

harassment was directed towards her due to her sex.  She states that the fact that the

pornography was offensive to both men and women does not immunize it for Title VII

purposes, citing as support Thomas v. Town of Hammonton, 351 F.3d 108, 118 (3rd Cir.

2003) and Hutchison v. Amateur Elec. Supply, Inc., 42 F.3d 1037, 1043 (7th Cir. 1994).

The evidence alluded to by Ms. Coolidge does not adequately demonstrate that the

alleged harassment was directed toward her because of her sex.  Ms. Coolidge states that

she believes that Mr. Willoughby left the videotapes for her, specifically, to discover.

Def.'s Mem. at 6, citing Coolidge Dep. II 190:8-191:4.  However, she introduces no

factual evidence whatsoever to support her speculation.  As previously stated, mere

conjecture will not support a party's claims to defeat a motion for summary judgment. See

Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001).  The videotapes were left

in a file cabinet with no indication that they were meant to be viewed by anyone in

particular, much less by members of a particular gender.  Further, no evidence has been

introduced that the material contained on the videotapes was specifically targeted as offensive to one gender; in fact, both Ms. Coolidge (a female) and Mr. Cook (a male) stated that they found the tapes to be offensive.[18]  See Coolidge Dep. II, 192:14-22, 220:11-18; Coolidge Aff. ¶ 54.

Ms. Coolidge has failed to demonstrate that she suffered severe and pervasive sexual harassment, that such harassment was based on her gender, and that the City negligently failed to prevent or remedy the situation.  Therefore, the Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's sexual harassment claim.


**C.    The Plaintiff's Retaliation Claims**

Ms. Coolidge further claims that the City unlawfully retaliated against her, first, when it failed to promote her to Mr. Willoughby's former position, instead hiring Mr. Mekki to fill the position, and again when it reprimanded and terminated her based on

---

[18] Ms. Coolidge asserts that the offensive nature of misconduct toward both men and women does not immunize it for Title VII purposes, citing Hammonton and Hutchison as support for this proposition.  See supra.  However, those cases are distinguishable from the situation here.  In Hammonton, a male police department trainer's conduct, in front of a class of both male and female trainees, included such acts as grabbing his own genitals, making "dumb blonde" jokes specific to women, referring to a problem as a "bitch," and referring to women as "pussies."  The court ruled that a trier of fact could reasonably conclude that the environment created for a woman was "qualitatively different" than it would have been for a man.  In Hutchison, a man referred to his female coworker as "Ms. Boobs," commented on females' dress and anatomy, and attempted to brush up against females; though men were present during some of these incidents, the court found that there was clearly a disparate effect on the female employees.  These cases differ both in quality and type from the case at bar.  The plaintiffs in Hammonton and Hutchison demonstrated overt gender-specific misconduct in contrast to Ms. Coolidge's mere conjecture that the tape was "meant" for her, a woman.  Her theory simply does not rise to the level of evidence presented in the cited cases.  Therefore, Ms. Coolidge has not demonstrated that the alleged harassment was directed toward her because of her gender.

violation of Crime Lab rules.  Under Title VII, it is unlawful "for an employer to discriminate against any of [its] employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).

A plaintiff has two methods of proof available to him or her to demonstrate retaliation.  A plaintiff may prove retaliation either through the direct method of proof or the indirect method, also called the "burden-shifting" method.  See Tomanovich v. City of Indianapolis and Indiana Dep't of Transp., No. 05-1653, slip op. at 6 (7th Cir. Aug. 8, 2006); Moser v. Ind. Dep't of Corr., 406 F.3d 895, 903 (7th Cir. 2005).

### Direct Method

Under the direct method of proof, the plaintiff must show via direct or circumstantial evidence that: "(1) she engaged in statutorily protected activity; (2) she suffered an adverse action taken by the employer; and (3) [there was] a causal connection between the two."  Tomanovich at 6 (quoting Moser, 406 F.3d at 903).

### Burden-Shifting Method

Under the burden-shifting method, a *prima facie* case of retaliation may be demonstrated by showing that: "(1) [the plaintiff] engaged in a statutorily protected activity; (2) [he or she] met the employer's legitimate expectations; (3) [he or she] suffered an adverse employment action; and (4) [he or she] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity."  Id.  If

the plaintiff can establish the existence of these four factors, the burden of production shifts to the employer to demonstrate a valid non-discriminatory reason for the action it took against the plaintiff. Id. at 6-7 (citing Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998)); see also McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). If the employer can demonstrate such a valid reason, the burden of production shifts back to the plaintiff to demonstrate that the reason given was merely a pretext for the unlawful retaliation. Tomanovich at 7 (citing Moser, 406 F.3d at 904). "A plaintiff can establish pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." Rand v. CF Industries, Inc., 42 F.3d 1139, 1145 (7th Cir. 1994). As this Court has noted before, "[a] 'pretext' is not merely a mistake or an imprudent reason; it is a false reason or a dishonest explanation, which, because of its falseness or dishonesty, raises a question as to whether the employer is hiding a discriminatory motive." Rice v. Indiana State Police, 149 F.Supp.2d 573, 581 (S.D. Ind. 2001).

### 1.    The Plaintiff's Retaliation Claim Based on Failure to Promote

#### a.    *Direct Method*

Ms. Coolidge alleges that the City retaliated against her for her statutorily protected complaints by hiring Mr. Mekki instead of her for the forensic scientist position. The City argues that Ms. Coolidge cannot demonstrate retaliation via the direct method, because she fails to demonstrate evidence of a retaliatory motive by the City, nor can she provide any

statements or actions by the City that directly or circumstantially indicate retaliation. Def.'s Mem. at 17.

Ms. Coolidge responds by stating that she can establish the three necessary elements of direct proof of retaliation.  First, Ms. Coolidge did engage in a statutorily protected activity, in that she complained of sex discrimination to the City, to the EEOC, and to the Court.  Pl.'s Surreply at 15-16.  Second, she states that she was subject to an adverse action taken by her employer, in that she was denied the promotion that she sought.  Third, she states summarily that "[t]he denial of promotion and additional sexual harassment were caused by plaintiff's complaints and her gender."  Pl.'s Surreply at 16.[19]

Although it is undisputed that Ms. Coolidge has adequately stated the first two elements required under the direct method,[20] the third element – the causal connection between her statutorily protected activity and the adverse employment action – is not established.  Ms. Coolidge maintains that there *is* such a causal connection, but puts before the Court no evidence establishing one.  Conclusory assertions are not evidence, and reciting the requirements of a test is not the same as meeting them.  See Stagman, 176 F.3d

---

[19] Further, Ms. Coolidge asserts that "[t]he defendant does not present a developed argument on the circumstantial method, and so, its perfunctory argument on this issue is waived."  Pl.'s Br. at 28-29.  However, the Court finds that the City does present a sufficiently detailed rebuttal of Ms. Coolidge's claims.  Ms. Coolidge has provided little to no evidence under the direct method of proof, and we find that the City responded adequately to what little it was given to work with.  The City's concise rebuttal to Ms. Coolidge's direct evidence claim speaks more to the perfunctory nature of Ms. Coolidge's argument than it does to any waiver of argument or lack of care on the part of the City.

[20] Failure to promote may constitute an adverse employment action.  See, e.g., Healy v. City of Chicago, 450 F.3d 732 (7th Cir. 2006); Jordan v. Summers, 205 F.3d 337 (7th Cir. 2000).

26

at 995.  Therefore, Ms. Coolidge has not overcome the City's entitlement to summary judgment on this ground.

>   b.   *Burden-Shifting Method*

The City also argues that Ms. Coolidge cannot prove retaliation based on failure to promote via the burden-shifting method of proof.  It claims, first, that Ms. Coolidge cannot establish a *prima facie* claim of retaliation, because she cannot meet the fourth required element for such a claim – that the plaintiff was treated less favorably than a similarly situated employee who did not engage in a statutorily protected activity.[21]

Ms. Coolidge contends that she can make a *prima facie* showing of retaliation, because she can demonstrate that she was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity.  Specifically, she asserts

---

[21]  The City proposes (though it is not part of its burden of production to do so) that John Cook, Ms. Coolidge's coworker, is a similarly situated employee who *was* treated the same as Ms. Coolidge, in that neither of them was promoted to the position ultimately filled by Mr. Mekki.  Mr. Cook did not file a Title VII action, also expressed interest in the position ultimately filled by Mr. Mekki, and was similarly denied it based on his experience and credentials.  Mr. Cook's employment history with the Crime Lab was virtually identical to that of Ms. Coolidge.  Therefore, the City asserts, Mr. Cook does not suffice as an example of a similarly situated employee treated differently, and Ms. Coolidge can point to no other coworkers who do; accordingly, she has not established a *prima facie* case of retaliation under the burden-shifting method of proof.  Ms. Coolidge disputes this point, because Mr. Cook complained with her about the pornographic videotapes and was a witness for her at her first trial.  Therefore, she asserts that he should be considered to have also engaged in a statutorily protected activity, and is thus not a valid comparator.  Pl.'s Br. at 30.

Ms. Coolidge may be right on this point – perhaps Mr. Cook cannot be considered a valid comparator.  However, this is ultimately immaterial, as the burden is on Ms. Coolidge to produce evidence of someone who *is* similarly situated and was treated differently.  Because she has not done so, as we will discuss <u>infra</u>, she has failed to make a *prima facie* showing of retaliation on this point.

that she was treated less favorably than Mr. Mekki, since he ultimately took the position that she desired.[22]

Further, the City argues that it had legitimate reasons for not promoting Ms. Coolidge to the position ultimately filled by Mr. Mekki.  The City maintains that Ms. Coolidge did not have the experience in forensic science necessary for the position, and that Mr. Mekki – with nine years of experience and multiple degrees – did.  It argues that Ms. Coolidge cannot establish that this legitimate, non-discriminatory reason was merely a pretext for its employment decision, as Mr. Mekki had qualifications that Ms. Coolidge did not have, and it was a legitimate business judgment to hire him instead of promoting her.  Further, the City notes that mistakes Mr. Mekki might have made *once hired* are not material to whether or not Mr. Hamby made a legitimate, non-discriminatory decision by hiring him; what is relevant is whether Mr. Hamby honestly believed Mr. Mekki to be the most qualified candidate at the time of his hiring.

Ms. Coolidge responds that the City's proffered reason for its employment decision is pretextual.  According to Ms. Coolidge, she was more qualified for the position, because she had a bachelor's degree from a "recognized" university, which Mr. Mekki did not.  She refers to the City's contention that Mr. Mekki had greater experience and training as "a lie."  Pl.'s Br. at 30.  She also cites as evidence the City's history of retaliation against her (presumably the subject of her prior lawsuit).  Pl.'s Br. at 31.

---

[22] The City disputes Ms. Coolidge's contention that Mr. Mekki is a "similarly situated" comparator for these purposes, citing the vastly different experiences and employment histories between the two candidates.  Def.'s Reply at 11.

We find that Ms. Coolidge has not adequately demonstrated a retaliation claim based on failure to promote under the burden-shifting method of proof.  First, she has not made a *prima facie* showing of retaliation, because she has not proven the fourth required prong of such a claim.  The law requires that Ms. Coolidge be able to show that she was treated less favorably than a similarly situated employee who did not engage in a statutorily protected activity.  See Tomanovich at 6.  Ms. Coolidge cites Mr. Mekki as her example.  However, Mr. Mekki is surely not a "similarly situated" employee.  Throughout her pleadings, Ms. Coolidge goes to great lengths to explain just how *differently* situated she and Mr. Mekki are.  Given their wholly different backgrounds and employment histories, the Court cannot possibly regard Mr. Mekki as a valid comparator.

Further, Ms. Coolidge has not demonstrated that the City's stated reasons for its employment decision were pretextual.  Ms. Coolidge's argument focuses on her qualifications for the position, and Mr. Mekki's comparative lack of qualifications.  Ms. Coolidge's bachelor's degree is from within the United States, and she had four years of experience in the Crime Lab.  Mr. Mekki holds an associate's degree from within the United States, a bachelor's degree from a foreign university, two other diplomas, and had nine years of forensic experience, largely outside the United States.  It is not for this Court to decide what experience and education are truly necessary in order to be a qualified forensic scientist.  It appears to us that the employment decision made by the City was reasonable and legitimate, and this is all that is required: "where an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified

candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." Millbrook v. IBP, Inc., 280 F.3d 1169, 1180 (7th Cir. 2002) (citation and internal quotation marks omitted). It does not fall to us to substitute our judgment for that of the Crime Lab in order to determine if its decision was the 'best' decision, so long as it was reasonable. All that the City must demonstrate (and in our view has demonstrated) is that the reasons for its decisions were honestly believed. See Jordan, 205 F.3d at 343. Ms. Coolidge has introduced no evidence to the contrary.

Further, Ms. Coolidge's contention that the City's history of retaliation against her evidences a pretext may not be considered. As we have previously stated, Ms. Coolidge's claims against the City in her previous settled lawsuit will not be reweighed by the Court in this case, given the principles of *res judicata*.

Ms. Coolidge has failed to demonstrate retaliation based on failure to promote via the direct method of proof, as she has not demonstrated a causal connection between her statutorily protected complaints and her lack of promotion. She has also not demonstrated retaliation via the burden-shifting method of proof, as she has both failed to make a *prima facie* showing of retaliation, and has not adequately rebutted the City's legitimate reasons for its decision as pretextual. Therefore, the Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's retaliation claim based on failure to promote.

30

2.      The Plaintiff's Retaliation Claim Based on Reprimands and Termination

The City also asserts that Ms. Coolidge cannot survive summary judgment on her claim that the City retaliated against her by reprimanding and terminating her based on violation of Crime Lab rules.  The parties discuss both the direct and burden-shifting methods of proof to some extent, so we will address both here.[23]

a.      Direct Method

The City asserts that Ms. Coolidge has not shown retaliation via the direct method because she has not established a causal connection between her statutorily protected activity and an adverse action taken by the City.  It asserts that the reprimands she was issued, and the termination that she ultimately received, were for violations of the Crime Lab's rules and policies, and Ms. Coolidge has not provided evidence to the contrary.

Moreover, the City claims that the two written reprimands received by Ms. Coolidge (one for failure to perform duties, and the other for unauthorized use of Crime Lab property) do not constitute adverse employment actions sufficient to sustain a

_____

[23] There appears to be some confusion between the parties regarding which method of proof – direct or burden-shifting – is being used in the arguments to allege retaliation.  This is not uncommon; indeed, "[s]uch confusion is understandable; there are several cases that arguably conflate the direct method with direct evidence. . . . The confusion lies in the fact that the direct method may employ circumstantial evidence along with or for that matter in place of 'direct' evidence."  Rudin v. Lincoln Land Cmty. Coll., 420 F.3d 712, 720 (7th Cir. 2005) (internal quotation marks and citation omitted).  It has been difficult to discern from the pleadings which method of proof is being argued by the parties at various points.  Given this confusion, we will construe what we perceive to be the best and most relevant arguments made by the parties, even if the headings under which the argument is organized do not make clear which method of proof is being addressed.

retaliation claim.  The Seventh Circuit has previously referred to "firmly established circuit precedent that a letter of reprimand is not an adverse employment action *unless the letter is accompanied by some other action, such as job loss or demotion*."  Krause v. City of La Crosse, 246 F.3d 995, 1000 (7th Cir. 2001).  See also Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998); Smart v. Ball State Univ., 89 F.3d 437, 442 (7th Cir. 1992).  The City maintains that because the reprimands received by Ms. Coolidge "did not result in a contemporaneous demotion, denial of a pay raise or other qualitative or quantitative change in the terms or conditions of her employment," they do not constitute adverse employment actions.  Def.'s Mem. at 24.

Ms. Coolidge counters that she has shown retaliation via the direct method.  She argues that she has established a causal connection between her statutorily protected activity and her firing.  Ms. Coolidge's claim is that the City reprimanded and terminated her as a direct result of her statutorily protected complaints.  She emphasizes the proximity in time between her complaints and the action taken against her, and the fact that the reprimands "[were] specifically for preserving the evidence for her complaint."  Pl.'s Surreply at 18.

Further, Ms. Coolidge states that the written reprimands *did* constitute adverse employment actions, stating that "when reprimands or evaluations affect other employment actions, such as termination, they are adverse actions," and citing Smart v.

32

Ball State Univ., 89 F.3d 437, 442 (7th Cir. 1996), as support for this proposition.[24]  Pl.'s

Br. at 32.  Because the written reprimands were cited by the City as part of the reason for

Ms. Coolidge's termination, she argues that they were adverse employment actions.

We find that Ms. Coolidge has not demonstrated a retaliation claim against the City

based on her reprimands and termination via the direct method, because she has failed to

establish a causal connection between her statutorily protected activity and subsequent

adverse employment actions.[25]  As this circuit has repeatedly stated, and as this court has

reiterated several times in this entry, mere conjecture by the nonmoving party will not

defeat a motion for summary judgment.  Albiero v. City of Kankakee, 246 F.3d 927, 933

(7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land

O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).  Ms. Coolidge's "evidence" that

establishes causality consists primarily of conclusory incantations that there *was* causality.

This will not suffice.  She does point to the timing of the disciplinary measures, stating

that the fact that they occurred after the incidents in which she attempted to preserve

---

[24] The Court, however, notes that Smart does not appear to support this proposition as
strongly as Ms. Coolidge would like.  Smart does support the proposition that reprimands
*accompanied* by a demotion might be considered adverse employment actions.  89 F.3d at 442-
43.  However, it nowhere states that reprimands that *affect* termination decisions in the future
constitute adverse employment actions.

[25] Because we find here for the City on these grounds, we find it unnecessary to establish
to a certainty whether or not the written reprimands constituted adverse employment actions in
this case.  We note in footnote 24, supra, that Ms. Coolidge appears to have overstated the
caselaw support for her argument that the written reprimands were adverse actions.  However,
neither party appears to dispute that Ms. Coolidge's eventual termination constituted an adverse
employment action.  Due to this, and because we find that Ms. Coolidge did not establish the
requisite causal connection, we need not make a definitive determination here.

evidence related to her Title VII claims establishes causality.  However, there is no dispute between the parties that these incidents – the copying and distribution to a third party of office materials – were the direct cause of Ms. Coolidge's reprimands and termination. What *is* disputed, and what Ms. Coolidge fails to prove, is that the real underlying cause of the City's actions was an unlawful animus based on Ms. Coolidge's statutorily protected activity.  Since Ms. Coolidge has not established this causal connection via direct or circumstantial evidence, she fails to survive summary judgment on these retaliation claims based on the direct method of proof.

     *b.*     *Burden-Shifting Method*

In addition, the City argues that Ms. Coolidge cannot prove retaliation based on these employment actions via the burden-shifting method of proof.[26]  The City asserts that Ms. Coolidge cannot identify a similarly situated employee who was treated more favorably than she was, as required by the fourth prong of the *prima facie* requirements under the burden-shifting method.  It states that Ms. Coolidge cannot identify anyone else who violated any of the rules that she did who was not similarly punished.  Mr. Mekki, the City contends, is not a valid comparator, because he had a different position than Ms.

---

[26] One of the City's arguments here is that under the third requirement of the *prima facie* showing of retaliation, the written reprimands issued to Ms. Coolidge did not constitute adverse employment actions.  Because this argument was previously addressed in our discussion of the direct method of proof, we will not rehash it here.  Because termination is an undisputed adverse employment action, and because we find for the City on other grounds, we have not considered this point.  See footnote 25, supra.

Coolidge, a wholly different performance history, and no history of reprimands.

Ms. Coolidge responds that Mr. Mekki is a similarly situated individual treated more favorably.  Ms. Coolidge relies on the fact that he also made a mistake that was detrimental to a case he was working on, but was not reprimanded for doing so, as she had been for her blood stain error.  She also states that "no other employee has been terminated or even disciplined for giving a laboratory note . . . to the employee's own attorney for production to the defendant."  Pl.'s Br. at 32-33.[27]

The City states that even if Ms. Coolidge were able to make the requisite *prima facie* showing, the Crime Lab's disciplinary decisions were based on legitimate employment-related reasons, and Ms. Coolidge cannot demonstrate that such reasons were pretextual.  The City claims that Ms. Coolidge was reprimanded and terminated because she violated the Crime Lab's rules and policies.  The fact that disciplinary measures were taken during the course of this lawsuit does not require Ms. Coolidge's supervisors to ignore her misconduct.  Hall v. Bodine Elec. Co., 276 F.3d 345, 359-360 (7th Cir. 2002).  The City classifies Ms. Coolidge's assertions of an unlawful motive as "conclusory" and

---

[27] Ms. Coolidge also states that "[w]hen only one employee is terminated, the employee need not offer proof of similarly situated employees."  As support for this proposition, she cites Bellaver v. Quanex Corp., 200 F.3d 485, 495 (7th Cir. 2000).  However, the facts of Bellaver are distinguishable from the situation here.  That case applied specifically to "mini-RIFs" [reductions in force], in which one employee's duties are redistributed among other employees because, essentially, that person's position has been eliminated.  In those situations, a plaintiff "does not need to make a showing that 'similarly situated' employees were treated better because the inference of discrimination arises from the fact that they were constructively 'replaced' by workers outside of the protected class."  Id.  Because no such facts are alleged here, no such inference of discrimination arises, and the "similarly situated" proof requirement stands.

without merit.  Def.'s Reply at 15.  Therefore, the City claims, Ms. Coolidge cannot demonstrate pretext here.

Ms. Coolidge states that the City's proffered explanations for its actions are pretextual.  She states that the City is "vague" by citing only to "the Crime Lab's rules and policies" in general terms.  She disputes the existence of actual policies against providing a copy of the pornographic videotapes and a copy of the lab note to Ms. Coolidge's attorney.  She further states that "there is evidence" that a supposed violation of the rules was not the honest reason why her employment was terminated.  Def.'s Mem. at 34.  The vagueness of the City's reasoning, Ms. Coolidge maintains, is evidence that the City is "lying" about its reasons.  Pl.'s Surreply at 19.

We find that Ms. Coolidge has not demonstrated a claim of retaliation based on the reprimands and termination under the burden-shifting method.  Ms. Coolidge has not made a *prima facie* showing because she has not established the fourth prong – that a similarly situated employee who did not engage in a statutorily protected activity was treated more favorably than she was.[28]  Further, she has not shown that the City's legitimate employment-related reason for its actions was pretextual.

The analysis here is substantially similar to that undertaken earlier in this entry. Mr. Mekki is not a valid comparator to Ms. Coolidge as a "similarly situated" employee

---

[28] In addition, the dispute over whether the written reprimands constituted adverse employment actions may affect the third prong of Ms. Coolidge's *prima facie* case.  However, because termination qualifies as an adverse employment action, and because we find for the City on other grounds, we decline to analyze this at length here.  See footnote 26, supra.

for the reasons detailed in section C.1.b.  Their employment histories, disciplinary records, and job descriptions were quite dissimilar, and Ms. Coolidge goes to great lengths to distinguish them in other parts of her argument.  Since Ms. Coolidge cannot identify anyone else who is a valid "similarly situated" employee who was treated differently, she has failed to meet her burden on this prong.

The City's reasons for Ms. Coolidge's termination seem to us again to be reasonable – and, in any event, honestly believed.  As previously stated, it does not fall to this Court to determine whether the "best" employment-related decisions were made by the City.  Rather, we need determine only that the proffered reason was not merely a mask for unlawful animus based on Ms. Coolidge's statutorily protected activities.  Ms. Coolidge twice revealed to a party outside the Crime Lab information that was contained within the Crime Lab.  It does not defy reason that the Crime Lab might view this as cause for discipline.  Ms. Coolidge relies heavily on the "vague" nature of the policies the City proffers as explanation for its action.  However, "vagueness" is not enough to show pretext.  Ms. Coolidge must show instead, through more than mere conjecture, that the City's explanation is a "false reason or a dishonest explanation."  Rice, 149 F.Supp.2d at 581.  She has not done so.

Ms. Coolidge sought to pursue legal complaints against her employer based on perceived disparate treatment.  She was statutorily entitled to do so.  However, she was *not* statutorily entitled to violate company policies meant to protect the confidentiality and integrity of sensitive matters as a means of pursuing this complaint.  The evidence before

37

us indicates that it was for these violations, and not for her underlying complaint against the city, that she was disciplined.  The fact that her actions were directed toward preserving evidence for her statutorily protected complaint is immaterial.  Compare Hall, 276 F.3d at 359 ("While Title VII protects victims of sexual harassment from being terminated in retaliation for reporting harassment, an employee's complaint of harassment does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior."); Durgins v. City of E. St. Louis, 272 F.3d 841, 843 (7th Cir. 2001) ("an employer that finds during [investigation or discovery] that it should not have hired the person in the first place may decide to end the employment without any objection that this is 'retaliation' for ... the suit").  It was the means, not the end, for which Ms. Coolidge was punished by the City in terminating her employment, and she has provided no evidence (other than mere conjecture) to the contrary.

Because we find that Ms. Coolidge has not established a *prima facie* showing of retaliation under the direct or burden-shifting methods of proof, the Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's retaliation claim based on reprimands and termination.

**D.  The Plaintiff's § 1983 Claim Based on Her Alleged Constitutional Injury**

In addition to her claims based on Title VII, Ms. Coolidge also claims that the City's actions violated 42 U.S.C. § 1983 because they demonstrate a custom, policy, or practice of Fourteenth Amendment retaliation.  Under Section 1983, "unconstitutional

policies or customs can take three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority."  Valentine v. City of Chicago, 452 F.3d 670, 684 (7th Cir. 2006) (quoting Rasche v. Vill. of Beecher, 336 F.3d 588, 597 (7th Cir. 2003)).

Our caselaw holds that a custom, policy, or practice must consist of more than an isolated incident of unconstitutional activity by a municipal body.  See Palmer v. Marion County, 327 F.3d 588, 596 (7th Cir. 2003) ("When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference.").  The practice must be substantially widespread to be violative of Section 1983.

Here, Ms. Coolidge asserts that the City has a policy and practice of retaliating against employees who complain about sexual harassment, of tolerating gender discrimination, and of "treat[ing] pornographic video tapes the same as all other video tapes."  Pl.'s Br. at 35.  Her claims appear to be entirely focused on her own treatment within the Crime Lab, as no other employees' experiences are mentioned in her pleadings.

We find without substantial difficulty that Ms. Coolidge cannot survive summary judgment on her Section 1983 claim.  Ms. Coolidge has addressed a few isolated incidents,

39

and, as we have stated, this does not rise to the level of a "custom, policy, or practice." She has provided no additional evidence that the incidents she addresses are part of a larger scheme of discrimination.[29]   As stated, a larger scheme of discrimination is necessary in order to impose liability on a municipality under a Section 1983 custom, policy, or practice claim.

Moreover, for the reasons we have articulated throughout this entry, Ms. Coolidge has not survived summary judgment on her claims under Title VII.  Therefore, she cannot survive summary judgment based on those facts under a Section 1983 analysis.  See Demick v. City of Joliet, 135 F.Supp.2d 921, 941 (N.D. Ill. 2001) (stating that because the court found that the defendant was entitled to summary judgment in its favor on the plaintiff's Title VII claim, it also must find that the plaintiff could not satisfy the evidentiary burden for her equal protection claim); McPhaul v. Bd. of Comm'rs of Madison County, 226 F.3d 558, 566 (7th Cir. 2000) (stating that "section 1983 claims generally follow the contours of Title VII claims").  Therefore, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's claim based on 42 U.S.C. § 1983.

## E.   Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment is

---

[29] It is worth noting that Ms. Coolidge's Section 1983 claim appears to be no more than a "tack-on" to her Title VII claims.  She addresses less than one page to it in her response brief, and less than half a page in her surreply.  She provides no additional information or evidence, but merely reiterates the conclusions reached in her Title VII arguments.

GRANTED as to all of Plaintiff's Claims.  IT IS SO ORDERED.


Date: _____08/30/2006_____                    _Sarah Evans Barker_
                                                  SARAH EVANS BARKER, JUDGE
                                                  United States District Court
                                                  Southern District of Indiana



Copy to:

Robin C. Clay
OFFICE OF CORPORATION COUNSEL
rclay@indygov.org

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@fed-law.com

Allison Wells Gritton
OFFICE OF CORPORATION COUNSEL
agritton@indygov.org